Hi. The Illinois Appellate Court is back in session. The Honorable Justice Margaret S. McBride is presiding. Good morning. Everyone please be seated. Masood MP v. Division of Professional Regulation. All right. Would the attorneys that are going to be addressing the court please step up to the microphone and identify yourselves for the record. Mike Goldberg for Dr. Masood. Mr. Goldberg, good morning. Good morning. Good morning. Assistant Attorney General Anna Gottlieb for Appellate.  Good morning. All right. Now each of you will have about 10 minutes to present your argument from that. Mr. Goldberg, you may save some time for rebuttal. Ms. Gottlieb, have you ever argued in the court before? This is my first time. All right. Mr. Goldberg, you've been here before. Well, I will still be next. People at your age look so much younger, and you look young, too. But Ms. Gottlieb looks particularly young, and I had not seen her before, so I thought I would ask and say welcome, and welcome to you as well. Thank you. All right. So with that, Mr. Goldberg, you may proceed. Thank you. May it please the court and counsel for the state, Dr. Masood comes before you today asking that you reverse the suspension of his license. He's currently on a two-year indefinite suspension. What I'd like to focus on first is the discipline. Dr. Masood had two patients out of thousands. Pain management is 3% of his practice. The two-year indefinite suspension, in light of the Cathan case, which I actually argued before this court a while ago, Cathan said that a six-month suspension for a psychiatrist who had had a relationship with a patient who was 20 years old seeking his psychiatric care would be appropriate. And they reversed on the sentence, or this court reversed on the sentence. The problem with this case is lawyers and not doctors. The director is a lawyer. The judge, the ALJ is a lawyer. The prosecutor is a lawyer. The only doctor that has seen this case is one doctor from the board. Now, we could have an argument because of COVID whether a quorum really needed to sign the final board recommendation. Only one did. But we have three judges, justices, lawyers sitting in judgment on a case, and there's no record of medical involvement, not the way there should be. We have an anesthesiologist from Rush brought in by the state. Dr. Masood practices in Joliet. He has his own practice. Pain management is a small part of it. Pain management is not anything, any part of this anesthesiologist's practice. What he knows and what he can give the ALJ or this court about what it's like to practice in Joliet for Dr. Masood is minimal. And yet I was not able to cross-examine the doctor on that practice. How are we reviewing that particular issue? That issue is a ‑‑ Isn't it an abuse of discretion? It is an abuse of discretion. Most deferential standard of review. Yes. All right. Yes. I didn't mean to be ‑‑ No, I'm changing my answer. I think it might be a mixed fact in law. Okay. I don't know that it's abuse of discretion. All right. Because there's a legal issue of whether I should be able to have cross-examined this expert. And you wanted to cross-examine him on two areas, was it? Well, essentially the difference in his practice, the difference between a Rush anesthesiologist with the staff and the administration behind you. So what were the two areas that you wanted to cross on? Well, on the difference of his practice and Dr. Masood's and the fact that he's not a pain management doctor, that his practice is not the same as Dr. Masood's or even close. So it's compounding. There's an undercurrent of the fact that there's no ‑‑ the board is supposed to sit on this. That's our position. The Medical Practice Act says the board has to oversee. We're not allowed to cross-examine this key witness on very important subject matter that prejudices our client. We go, the law that we cite says that we're supposed to get a report or information upon which this doctor is going to testify. We didn't get that either. Did you have a report of your expert? Did you tender a report of your expert? I did not. Okay. But we're not ‑‑ I know you don't have to, but you're complaining about something and you didn't tender any report of any kind. Right. But this is the state. I'm going against the state. It's their burden. No question. I completely agree with you. Compounding the issue is this interjection of a criminal statute. So the way the law is written is it says, hey, doctor, if you're found guilty of this controlled substance act, we can discipline you. Does that make sense legally to you? Yes. All right. Yeah. There are other instances in the act, 225 ILCS 60‑22. That's the discipline section. There are over 50 instances in which you can get disciplined. And in more than one instance, they say, look, if you get disciplined at a hospital or in criminal court, Medicare, Medicaid, insurance companies, we can discipline you for that. But what the department has done here is they've taken that statute and said it's not just enough that you are found guilty because that statute has an intent, a criminal intent attached to it. They're saying we're going to sort of put it into the medical practice act. That's their interpretation and say we're going to use a clear and convincing standard in this criminal statute to decide if you should be disciplined or not. If that's what the law said, I'd be arguing that that's wrong, but that's not even what the law says. The law says we're going to discipline you if you're found guilty of that statute. He was never charged with that statute. He was never found guilty. So that goes to the manifest way to the evidence of them proving their case. And the other thing ties into the cross-examination of the witness, because this witness, if you agree that the Controlled Substance Act is not a basis upon which on clear and convincing evidence you can discipline a doctor, then what's left is the unprofessional or dishonorable conduct. That's the other statute that the state is seeking to discipline him on. And there the expert gave no testimony on that. There was nothing. It's all a matter of there's too many prescriptions. So is it unprofessional to hire a nurse without checking into that person's background and learning that that nurse had a, what was it, a conviction or was on probation for controlled substance possession? Her license was on probation. Is that unprofessional? It's an excellent question, because I asked that same question of the doctor and their expert, and the expert said he would have no idea. He himself, their expert said, I got him to admit on cross-examination. So he wouldn't know pine on that? No, he said, I would have no idea if the nurses I worked with are disciplined or not. That was a direct answer to a direct question. Was he on trial or was this sort of a different question? It's cross-examination. I want to touch upon the indefinite suspension, because this is important. Well, isn't that what always occurs, except that they're, in this case, and in the one you cited, it's an indefinite suspension up to at least two years. And in the other case, you said he got six months. Now, that can be reviewed at the end of the two years or the six months, right? Very important for Dr. Massoud and for all the doctors out there, because the department is reading or interjecting the word indefinite, and it's majorly impacting that. Because Dr. Massoud's suspension is going to be over in November. It is? Yes. Well, it should be. He has to petition. He has to petition. That's not what it says in the hearing. What it says in the act is that he would be entitled to an investigation and a hearing, sort of like a new process, if they felt that something was wrong. Here, it's presumed that it's wrong. Presumed. You have to ask for it back. Okay. And the legislature has said, if you are convicted of health care fraud in another court, you shall be automatically and indefinitely suspended. That's the department's rules. It would be simple for them to put that in the act that applies to Dr. Massoud, but they didn't. This issue has never been brought up. So here's the problem. The state will be able to say, well, there's this case and this case and this case, and they were all affirmed, and those had indefinite suspensions, but that wasn't appealed. So that doesn't prove anything. We're coming here before you with what I believe is a new argument, and I've never made it before. Well, did you make it in your brief? Yeah, no, I mean, yes, yes. How do you believe you couched it in this particular brief? Oh, I've couched it. I've been in front of this court on documents. No, I know, but how did you precisely argue that the language of this being indefinite is a violation of your client's rights? So it's page 5. Yeah, what does it say? It says, the director's imposition of a two-year indefinite suspension violates the online Supreme Court's requirement for uniformity in administrative disciplinary sanctions. The director abused her discretion in imposing an indefinite suspension of Dock Institute's license for a minimum of two years because the discipline was not warranted by the underlying facts. And you didn't cite, like, the facts of these other cases or anything, did you? Yes. Okay, well, then maybe I'm thinking that you really can't compare other dispositions regarding an indefinite suspension. The reason why I'm bringing it up is that you will find appellate court cases where a doctor's indefinite suspension was affirmed for other reasons. Yeah. We are directly challenging that issue in our briefing before you. Yeah. And it's a de novo review because what I'm saying is that it's simply not in the law. And I have assistance from the department because they put it someplace else where they specifically wanted the suspension to be indefinite. And then they say, here, you get a hearing on how long it has to be before you can even ask for it back. Right. They're imposing that same thing on Dr. Massoud even though the law they're using does not have that provision in it at all. Okay. Finally, in terms of the board, Cathan is one of the other issues that we brought up on Cathan is that it says that the board is supposed to hear these things. There's a I guess if you look at Abramson, which is a Supreme Court case in Cathan, which is from the first district, you could read those together to say that at least the transcript has to have been read. Did they all sign off on reviewing the record? The record does not mean the transcript, but they do. They do. Here only one judge, only one judge. You think that the record does not contain the reported proceedings? I don't know. I mean, they all signed off on that they reviewed the record in this case, didn't they? Yes. But you're saying that that does not mean that they actually reviewed anything, right? It doesn't mean they read the transcript. Okay. How do we know that? Well, how do we know they read the transcript? Because they say they all signed off on reviewing the record. They're asking us to consider that they didn't, so I'm just asking how do we know that? There's no way to know. I don't know. I don't know what was available. I know what the record is when I go to do the complaint for administrative review and I'm at the daily center because they file that as an answer. I know what the record is here, but I'm not privy to what they see. I don't know that that's part of the record, exactly what they review. You're asking me, and I've had other trial court judges agree with my assessment, just in terms of we don't, you know, it doesn't say that they reviewed the entire transcript. The issue about the transcript is important because the board has statutory responsibility to do this. We can't just discipline doctors, just lawyers doing it. The board has to take some active part. And that means that they have to read what these experts say and they have to assess the credibility of the expert. It's not enough to just say I reviewed the record. I mean, they have a more important job to do. And I don't think, unless I'm wrong somewhere in the record, that you could say we have a Well, I don't think there's any requirement under Abrahamson, Kaifman, or any other case that the board has to say that they reviewed the transcript. We presume that agencies act lawfully. And, I mean, we presume that they read what transpired. I don't think just saying, you know, because they signed off and said they read the record makes it that they didn't do their obligation. I think Abrahamson says that at least one board member has to be present, then I can tell you Okay, well, I think we probably have to disagree with you on that one, too. It says, well, Kaifman says that they clarified that Abrahamson meant that no board members are required to be present at the hearing so long as they review the record of proceedings before rendering their recommendation. That's in paragraph 33 of Kaifman. So, I mean, I don't think that either of those cases is incompatible with what the board did here. But we also do presume that they acted lawfully and that they, you know, performed their obligation. And, I mean, I think that that's our obligation, too, that we have to presume that these board members considered what took place and read about it. I don't disagree. I know that's the law. All right. But you're saying that this wasn't sufficient. I think I understand. But just saying you reviewed the record is not the same as saying you read the transcript and considered the testimony in rendering the decision. And they do make a report. And the report is, there's nowhere where they're analyzing the difference between the doctors. The analyzing is from the judge, the ALJ. Right. And the director. And the director. But we have no way to know. I mean, one person signed here. Most of the time a quorum signed. But they don't give the court or anyone any input into what their thought process was or what they did or didn't do. The record, though, kind of explains a lot of what happened at the hearing, doesn't it? Yes, it does. There's a significant amount of evidence that was presented. Yes. It went over for many days and COVID made it last, you know, very long. But so I want to just, I'd like to say one more thing is that their expert admitted that. Dr. Buchandran? Yes. I'm not sure if I'm saying. I don't know. Yes. He said that MS, he admitted that was therapeutic. So that's an important point. You really have SW, the nurse, that he also admitted that he would have, their expert admitted he would have had no idea if that person were disciplined. And she was grandfathered in to, she had all those drugs, and she was his patient for a short amount of time. So. How does that work? You get grandfathered in to what? Oh, that concept is very important. No, explain it to us. So if you're a doctor and someone comes to you and they have pain and they're not taking anything, you've got a clean slate. You prescribe what you prescribe. If I've been on certain narcotics and soma and barbiturates for quite some time, you can't just take me off. It takes months to wean someone off of those drugs. So that's, you know, we use that term in law, grandfather. They use it as well in medicine. So that the new doctor has to continue with the previously prescribed drugs for the pain management. Well, first of all, initially, yes. But then you have to wean that person off. You can't just say, I'm going to. Yeah, cut you off. Yeah. All right. I don't know if I have any more time for rebuttal, but I. We're going to allow you to have some rebuttal. Okay, thank you. All right. Ms. Gaffney. Good morning. May it please the Court. I am Assistant Attorney General Anna Gottlieb representing Appellees. This Court should affirm the decision of the Director and affirm the judgment of the Circuit Court because the Director here did not clearly err when she determined that plaintiff violated multiple provisions of the Medical Practice Act and the Controlled Substances Act. Nor did she abuse her discretion when she imposed a minimum two-year suspension of plaintiff's licenses. And none of plaintiff's other challenges are reasons to disturb the well-reasoned decision here. To begin, the Director did not clearly err when determining that plaintiffs violated the two statutes. There's ample evidence in the record in which the Director relied when making this determination. First, with regard to patient SW. The evidence here showed that plaintiff prescribed her dosages of controlled substances that were not clinically justified, that he increased those dosages without any change in condition, and that he prescribed these medications despite her being on probation as a nurse for abusing controlled substances. And similarly with patient MS. The evidence showed that this patient traveled across state lines to obtain prescriptions for years, that this patient repeatedly claimed that his prescriptions had been lost or stolen, and the plaintiff continued prescribing her medications under those conditions. And most egregiously here, his family informed Dr. Massoud that he had issues with overdosing, with illegal criminal activity, at which point the plaintiff here terminated the doctor-patient relationship, but yet continued to prescribe him more controlled substances for a period of eight to nine months. These pieces of evidence show that the Director did not clearly err when determining that these violations occurred. What about the issue about the hearing officer viewed the evidence about SW and MS in a different standard? Was it an objective instead of a subjective intent? And that actually they should have looked at the subject here. So I'd like to address this intent argument for several reasons. First, I'd like to point out that this argument has been forfeited. It was not raised at the administrative level. It was not raised in the complaint for administrative review. It has been raised for the first time in appeals. So for those reasons, it has been forfeited. But even if it wasn't, the intent argument that plaintiff is making only refers to the violation under the Controlled Substances Act, Section 312H of that. And even if we are to read this element in the way the plaintiff proposes here with the subjective intent, there's still enough evidence here to support a finding of intent. So specifically, for instance, to start with SW, the fact that he was prescribing medications that weren't clinically justified, that shows the requisite intent here. And with MS, again, once his family informed him that he was abusing these substances, the fact that he continued to prescribe these medications, that is evidence that satisfies this intent element, even under the subjective standard. So there's no concern under the Controlled Substances Act here. And do you agree that counsel has sufficiently raised this claim about the indefiniteness of this suspension because of the legislative language that you're improperly relying on? I believe that this specific argument that this is not what the legislator should have intended is also new here and for that reason is not preserved. But I'm happy to address the merits of it. First of all, that this Court has repeatedly upheld these types of suspensions in many cases, not just cases involving insurance fraud or kickbacks. For instance, the Perry case, which we cite in our brief, is a case involving patient care, and there a one-year minimum sentence was imposed. And there's no inconsistency here with anything in the Medical Practice Act. So Section 43 contemplates the way the department is to restore a license, and there the statute tells us that after a term is completed, the department may restore. It doesn't say must restore. It says may restore. So here the director rendered her decision in November 2021. So in November 2023, the plaintiff can then petition to restore his license. That section basically is exactly what an indefinite suspension would look like. And more broadly, Section 22 of the Medical Practice Act also gives the director wide latitude to impose various types of disciplines. So there's no inconsistency here, and also the argument is not preserved. And speaking about the discipline here more broadly, the Court here is to defer to the agency's expertise, because the agency has expertise and experience in determining what type of sanction would best protect the public. And here both the ALJ and the director properly weighed the many aggravating factors of this case. For instance, the director relied on the fact that the plaintiff had been previously disciplined by the DEA, that these offenses were serious and they contribute to the opioid epidemic, that these had a profound impact on the individuals at issue, the two patients, and that plaintiff lacked nutrition. So there's strong aggravating factors here that warrant the sentence imposed that is to be reviewed under an abusive discretion standard. What about Counsel's argument when he started? He said that it's the lawyers. The lawyers were involved in reviewing everything and making the determinations, and no medical experts or professionals were involved. Yes, so that's a great question, Your Honor. I mean, here I'd like to point out in the record on page 378, which is where the board provides a recommendation to the director that tells us that the whole board reviewed the record here, which is what is done in these proceedings. The board is a group of medical professionals, so there's no support for the argument that there were no physicians involved in making this determination. And then that was passed along to the director who rendered the final decision. But again, the record tells us that the board reviewed and that the majority of the board signed on to these recommendations made to the director. And since we're kind of at that point, I'd also like to briefly address the argument that the board members needed to be present here under Abramson and Kaven. That is not the requirement either under Supreme Court precedent or this Court's precedent, so there's no reason to reconsider that in this case. And briefly, I would also like to address the standard of review here for the evidentiary rulings. The standard of review here is an abuse of discretion standard, so the plaintiff raises several arguments with regard to the expert, and any evidentiary rulings made by the ALJ are to be reviewed for an abuse of discretion, and the plaintiff also needs to show prejudice stemming from any reported errors. And here, not only was there no abuse of discretion, but there was also no prejudice resulting from those. So there were two lines of questioning that the plaintiff claims should have been allowed when the department's expert was testifying. And with regard to one of those lines of questioning, which was whether the department's expert, whether his practice allowed or whether his practice used drug screening, the ALJ actually allowed that testimony for one of those questions, and the expert said, yes, we do engage in those. So there's no plausible inconsistency here on which the plaintiff could show prejudice. And with regard to the second line of questioning, the plaintiff wanted to ask the expert about whether he treats low-income patients, and there's absolutely no prejudice that could stem from this type of, from not allowing this testimony. I think there were three questions, whether the patient had, whether a patient has ever told the doctor that they don't have insurance, he or she, whether that patient had ever not followed instructions for pain management, and whether the doctor ever had a patient come to him with limited resources. Those were the three areas of inquiry that he feels he was improperly prohibited from examining. Correct. So taking the other position is now that this is an abuse of discretion. He, Mr. Goldberg, said it was, but then he said, no, it's really clearly erroneous because it's a question of fact interbreeding a law. All right, so these three cases are brief to support that this is an abuse of discretion standard and also that prejudice needs to be shown. So for instance, the questions about whether he's treated low-income patients, the standard of care wouldn't be different for whether the expert treated low-income patients. So there's also no kind of plausible argument that that would have changed the outcome of this case in any way. And in any event, there's so much evidence here, not just based on the expert testimony, but also from the medical records themselves, from Dr. Massoud's testimony, that really show that he made these egregious lapses in the standard of care. The hearing officer, or the entirety of the proceedings, the doctor was found not to have overly prescribed for the whole year, right? Is that one of the findings that the ALJ made, that his number of the prescriptions was not, that the board, yeah, that it hadn't been established that he was over-prescribing, right? I'm not sure I understand. I thought I was referring to the count one of those. Yeah, what was count one? Count one referred to kind of a broad allegation that he had prescribed, I believe, a quarter million tablets over the course of two years. Was it a quarter million, or was it a different number? I believe it was 750,000. That's three quarters. Sorry, yes, three quarters. Was that over two years, or was that over one year? I believe that was over two years, but that's not an issue in this case. No, I know, I know. But that's like 1,000 pills a day for two years, isn't it, prescribing 1,000 pills a day? But his percentage of his patients was only 3% for pain management. Right, so the department did not end up putting in evidence with regard to that count, so we actually don't have kind of a record. No, I know, but there was evidence in the record that there was a number. Three quarters of a million. Yes. And that was not sustained. That was not sustained, but I will say that with regard to patients, SW and MS, there is very specific evidence introduced about how much was prescribed to each of those, and those numbers were also very high. And on that point, I believe the issue was raised that, you know, this was just 3% of his total practice, but really even if controlled substances did not make up a large part of his practice, being a licensed physician means that you are prescribing all kinds of medications, sensitive ones that require you to follow guidelines. So that's another reason why the sanction imposed here is appropriate, because otherwise Dr. Massoud would be in a position to prescribe. Well, the report is rather extensive that the ALJ initially prepared, which was almost 90 pages long. Absolutely, Your Honor. Which details what he found, and then, of course, the director approved it, and then the board affirmed. That's absolutely right. And there is ample evidence here to support all the findings of the director and the conclusions that both the Medical Practice Act and the Controlled Substances Act were violated. So this Court has no more questions. All right. Thank you. We ask the Court to adjourn. Thank you, Mr. Goldberg. With respect to waiver, the Complaint for Administrative Review, page 8, brings forth this argument about the indefinite. So we've been saying this for quite some time in this case. And with respect to the Controlled Substances Act and having the specific intent that was even before the Complaint for Administrative Review, that was on the record in the motion for rehearing, I think it bears. So I don't think we waived either of those arguments. The ALJ makes this recommendation, and he or she takes quite some time to do it, and it's pretty detailed. And then, ultimately, the director signs off on a final order that could be months or a year later. There's nothing before this panel, and there's nothing in the record, to say what happens between when the ALJ makes that recommendation and the director makes the final decision. It's a mystery. I've been practicing before the Department for almost 30 years. So it is a ---- He was practicing during that time frame, right? He was. All right. Correct. But he's not, you know, his two-year suspension, he's incurring for two patients, he's been incurring for quite some time. But what I'm trying to say is that no one knows when that judge's decision is going to come down. There's no specific time. It varies. And then when you get the judge's decision or recommendation, it's pieced together with the signature of the board. And then you get a chance to do a motion for a rehearing to the director. The director, 99% of the time, ignores you, and you have your final order. But there's no knowable process in between the ALJ's recommendation and when you get that recommendation with the board's signature. Nobody knows. And it's important to know what role the board is having in disciplining these doctors. I just wanted to make that argument. The cross-examination, those three questions were just ---- that was what the judge allowed me to make a record for, for purposes for this. So years later, an appellate court could see what I was trying to do. Those weren't the only three questions I was asking. The hearing hadn't been taking forever. I could have asked many more questions. Why am I being cut off of cross-examination for no reason when the law clearly provides cross-examination and I didn't have the report? And, okay, fine, maybe I didn't give a report, they didn't give a report. Why not let me ---- we don't get depositions. Why not let me cross-examine the doctor for no reason, no good reason? Finally, transposing this criminal statute, there are doctors out there today over-prescribing. Count one was not proven. There was no evidence. There was a number. We don't know if it was made up or if it was real. Nothing was there. There are doctors that are dealing drugs in pain clinics. They go by the department. They get disciplined. They get a two-year suspension. To have this doctor in two cases ---- Explain to us, wait, what you mean by the doctors that are dealing. Give us an example of that. A pain specialist and people go in and they pay cash and they don't check to see if they have something real or not and they get pain medicine. Okay, but when somebody comes from Ohio and their prescription hasn't run out or they say they've lost the medicine, was that one of the things here? Stolen. The fellow from Ohio said he lost it and he also said his prescriptions were stolen from him. Were stolen one time. So that's a good point. But then there were family members who said he has an addiction problem. Stop giving him these pain medications. Then there were other family members who said that those people that complained were drug users themselves. But wasn't there an absence of any of this in the doctor's documentation? No. It was in the record. Okay, so it was in the record that the family said this, you know, he's got a problem, you're overprescribing, he's making all the traditional excuses an addict makes. There are traditional excuses. Yes. All right. It's in his chart. We only know about it because he put it in there. But you're basically saying there aren't any red flags of any kind here at all. He's different from the drug dealing doctors that take money and give the prescriptions. What about the increasing of his nurses and changing medications? I mean, was there some testimony about that too? The nurse took it back. Prescribing multiple things. Are those signs, are those any red flags ever? Yes. All right. But that does not warrant a two-year suspension indefinite. Okay. Can the board do a straight-out one year? Yes. Okay, but they didn't choose to do that here. How do we review that? Is that an abuse of discretion? Whether they chose to give it a flat two years, a flat year, or like they did here. It's an abuse of discretion. Okay. Yeah, and that's a pretty tough standard of review. You are conceding that standard of review for the sentencing, aren't you? I have no choice. The case last sentence. But you do challenge the nature of it, that there's something really wrong about having. You're saying that the Medical Act and the Controlled Substances Act, that there's a conflict so that they shouldn't be allowed to do this in this case, right? Correct. All right. Well, that's a legal argument. I mean, I think that that probably is reviewed differently than an abuse of discretion. That's why I changed my answer on that. But I would like to. . . I guess I'd end with the indefinite suspension because that is. . . To get his. . . The way it should be is they would look and see certain factors, and then they would make a determination to say, you know what, in this case we've investigated, and we looked and we said, wow, this guy was. . . Hasn't he agreed that he will no longer in any way, shape, or form be involved in pain medication? Yeah, he testified to that. Okay. So isn't that something, though, that he. . . Is that a given for purposes of him trying to get his license restored? Yes. Couldn't the board say, okay, we're going to give you back your license to practice medicine, but you are prohibited from any pain medication prescriptions? If we were following the law the way it would be, by December he would have his license back that way. Even the system working, it's going to take another year because they. . . Why? Why? Why do they agree that based on his statements that he will no longer prescribe any, he won't treat anyone for any pain medication, why wouldn't they consider that in releasing him from his indefiniteness? They will, but it will take a year because of the word indefinite. If they know that it has to end on a certain date, then all that has to happen before because he's no longer suspended. They've created a year, and I can tell you sometimes it takes two years because of the legal wrangling because unfortunately the medical board has abrogated their responsibility to the lawyers. That's essentially the problem. But somebody needs to tell the board that they have to take some responsibility for disciplining these doctors and not allowing the board or the department to create a discipline category that doesn't exist would be a good start. Thank you. All right. Thank you both. The case was well argued, well briefed, and we will take other advisements.